1

2

3

4

5

6

7

8    **IN THE UNITED STATES DISTRICT COURT**

9    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   DAVID BERTAGNA,                          No. CIV S-08-0049-JAM-CMK-P

12              Petitioner,

13        vs.                                  <u>FINDINGS AND RECOMMENDATIONS</u>

14   D.K. SISTO, et al.,

15              Respondents.

16   _____/

17              Petitioner, a state prisoner proceeding with retained counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the denial of parole in 2006.

19   Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1),

20   respondents' answer (Doc. 10), and petitioner's reply (Doc. 13).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

The state court recited the following underlying facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:[1]

> Defendant admitted to the police he was present when the victim, Felix Wusstig, was killed.  However, he said another person had actually killed Wusstig.  Witnesses had seen defendant and Eric Warner with Wusstig immediately before Wusstig disappeared. One witness testified at trial defendant had admitted shooting Wusstig.
> Prior to trial defendant made an in limine motion to have certain hearsay statements by Warner admitted under the declaration-against-interest exception to the hearsay rule.  Warner had made statements to several people, including police officers, indicating he had shot Wusstig. Warner said he had acted in self-defense.  Warner later said defendant had shot Wusstig.

The trial court denied petitioner's motion to admit Warner's prior hearsay statement that he shot the victim in self defense.  Petitioner waived a jury trial and was ultimately convicted of second degree murder and sentenced on August 6, 1990, to 15 years to life in state prison.  On direct appeal, the California Court of Appeal found no error in the trial court's denial of petitioner's motion regarding Warner's statement and affirmed the conviction and sentence.

On June 21, 2006, after having served the minimum term on his sentence, petitioner appeared before the California Board of Parole Hearings ("Board") for his fifth parole suitability hearing.  The Board granted parole.  In announcing the Board's decision, the presiding commissioner made the following statements, among others:  "[Y]ou are . . . the most grounded inmate I've ever come across who has done the most self-reflection of anyone I've ever known" and "[y]ou seem to have just tremendous insight into behavior and what to do about it so I

/ / / / /

/ / / / /

---

[1]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

wanted to compliment you on that before we go . . . on here."  The Board also commented on

petitioner's commitment offense as follows:

> . . . We considered the manner in which Mr. [Wusstig] was killed.  We
> considered the manner in which his body was disposed and we considered
> the impact of this crime.  And we also considered your prior unstable
> social history and your prior criminal record.  We talked a lot about the
> crime as far as the details of it today.  Needless to say, it was – it was – it
> was an awful crime and it did result in the death of your friend's brother
> and it was a terrible circumstance.

Regarding petitioner's history while in prison, the Board stated:

> . . .Certainly, while Mr. Bertagna's been in prison he has definitely
> enhanced his ability to function within the law upon release.  He's
> participated in many things.  He has upgraded educationally.  He has his
> GED plus a high school diploma and he has done some work on some
> college courses.  He's participated in a great deal of self-help, that includes
> things, but is not limited to things such as Breaking Barriers, Alternatives
> to Violence, both the basic and the advanced, Cage Your Rage, Anger
> Management, the Myth of Freedom.  He's been participating in AA since
> '92 and NA in addition to AA since '05 and recently in Crim-Anon in '06.
> And once again, that's just a smattering of the work that he's done.  That
> certainly isn't everything that he's done. . . .  He completed vocational
> refrigeration and air conditioning.  He was the sheet metal lead man for
> seven years and certainly has acquired skills in that area, as well as skills
> in lead removal.  Commissioner Harmon noted while we were deliberating
> that when he's worked, he's usually worked his way up to being a lead
> man or a trainer.  Certainly he's grown and matured.

The Board also outlined petitioner's plans upon release:

> . . . He has very good parole plans, lots of support from his family.  In fact,
> his family has built him a home.  I think maybe this may be the first time
> I've seen that.  He has job offers.  He has offers for additional interviews.
> Once again, lots of family support. . . .  He has a budget, so he has really
> thought about what he needs to have in order to be successful in parole.

Notably, the Board observed that petitioner "has had no 115 disciplinaries and no 128(a)

counseling chronos through his incarceration."

On November 13, 2006, Governor Arnold Schwarzenegger reversed the Board's

decision.  The governor's reversal was primarily based on the unchanging facts of petitioner's

conviction offense and criminal history, although the governor also referenced the Shasta County

District Attorney's opposition to parole "based in part on the gravity of the murder he

committed."  As to petitioner's criminal history, the governor stated:

> Mr. Bertagna was 25 years old when he perpetrated this life offense.  He had a juvenile record consisting of adjudications for petty theft and willful disobedience, burglary on two occasions, and violating a court order.  As an adult, Mr. Bertagna was convicted of petty theft, failure to appear, battery, violating probation, insufficient funds, driving under the influence on two occasions, and possessing a controlled substance.  According to his rap sheet, he was also arrested, but not convicted, for battery on two occasions, inflicting corporal injury on a spouse/cohabitant, injuring a telephone line, robbery, possessing a weapon, and battery with serious bodily injury.  According to the police report for the latter incident, which was submitted for inclusion in the record, Mr. Bertagna and four others entered a residence without permission and severely beat a man inside.  Responding officers found the man with a broken nose and injured teeth, and observed blood on the man's clothing, and on the walls and a mattress.

Regarding the facts of petitioner's commitment offense, the governor stated as follows in his decision:

> Despite the positive factors I have considered, the second-degree murder for which David Bertagna was convicted was especially grave, in part because the manner in which David and his partner killed Felix Wusstig – assaulting him, shooting him twice, cutting his throat, and burning his body – was exceptionally vicious and demonstrated an exceptionally callous disregard for Felix's suffering and life.  David told the 2006 Board that he gave Eric Warner the gun and then "I started assaulting Felix."  At that point, David told the panel, "Eric walks around to the front of the truck, he reaches up with the gun, and he shoots Felix once.  Felix screamed momentarily, it was a yell, and then he shot him again."  Then, as David told the panel, "Eric goes, he's still breathing.  I said, there's no way, man, there's no way a man could still be breathing after that.  And Eric goes, he's still breathing."  David told the panel that Eric then reached in his pocket, pulled out his pocketknife and cut Felix's throat.  David said he and Eric then dragged Felix's body behind a stump, disposed of the gun and the knife and drove away.  They later returned to the scene with Felix's truck and drove Felix's body "to a remote location and that's when we took Felix out and put him in his truck and poured gasoline [and] ran a fuse and then lit it and then we took off.  We didn't even see the truck go up.  We just wanted to get out of there."  David had numerous opportunities to stop the murder – after giving Eric the gun, after assaulting Felix, after Eric shot Felix twice, and after Eric cut his throat – yet he did not seek help and chose to continue.

>         \* \* \*

> . . . The gravity of this senseless crime is alone sufficient for me to conclude presently that David's release from prison would pose an unreasonable public safety risk.

4

1  Regarding opposition from the Shasta County District Attorney, the Board recited the following

2  from a June 7, 2006, letter:

3              The Shasta County District Attorney's office continues to strongly
       oppose the granting of a parole date for this inmate. . . .  The inmate is
4       unsuitable for release because less than 17 years ago he and his crime
       partner facilitated the brutal assault, shooting, and throat slashing of an
5       unarmed, intoxicated man who had not quite reached his 38th birthday. . . .

6  The letter also references the "murkiness of the psych reports authored so far in this case."

7              Petitioner sought habeas relief in state court from the governor's reversal of the

8  Board's decision.  On August 17, 2007, the Shasta County Superior Court issued a reasoned

9  decision denying habeas relief.  The court stated:

10             The primary consideration in denying parole is whether the
       "gravity of the current convicted offense or offenses, or the timing and
11      gravity of current or past convicted offense or offenses is such that
       consideration of the public safety requires a more lengthy period of
12      incarceration. . . ."  Penal Code section 3041(b).  In reviewing the
       Governor's decision, the court must "view the record in a light most
13      favorable to that determination."  (citation omitted).  Denial of parole by
       the Governor is subject to judicial review only to determine if his decision
14      was supported by "some evidence" and that the requirements of procedural
       due process were followed.  (citation omitted).  "As long as the
15      Governor's decision reflects due consideration of the specified factors as
       applied to the individual prisoner in accordance with applicable legal
16      standards, the court's review is limited to ascertaining whether there is
       some evidence in the record that supports the Governor's decision."
17      (citation omitted).

18             Here, the Governor based his decision to deny parole on several
       factors:  The second-degree murder for which the petitioner was convicted
19      was especially grave; the manner in which the petitioner and his partner
       killed their victim was exceptionally vicious and demonstrated an
20      exceptionally callous disregard for the victim's suffering and life; and the
       apparent motive for the offense was extremely trivial.

21
               The court finds there is some evidence to support the Governor's
22      position, as demonstrated by those facts cited by the Governor in his
       [decision].   The Governor's Review also indicates he took into
23      consideration all of the factors establishing suitability for parole and
       weighed them against the factors establishing non-suitability.  Thus,
24      Petitioner was afforded the due consideration the law requires.

25  The California Court of Appeal denied habeas relief without comment or citation on October 11,

26  2007.  Respondents concede petitioner's claim is exhausted.

1    Because the Shasta County District Attorney's February 2006 letter referenced

2    psychological evaluations, the court will summarize those here.

3    2006 – Prior to the June 2006 parole hearing, contract psychologist Charles

4    Taylor, Ph.D., interviewed petitioner and prepared a report.  Regarding petitioner's psychiatric

5    history, Dr. Taylor stated:

6        He was hit in the head with a pipe cracking his skull and ribs during a
         robbery and was hospitalized for about a week with no known subsequent
7        symptoms.  He has denied impairments or illnesses.  He has denied any
         psychiatric history or treatment.  He has denied any history of suicidal
8        ideation.

9    As to petitioner's mental status, Dr. Taylor reported:

10       He appeared as clean, clear, and logical.  He was oriented.  He denied . . .
         any assaultive impulses in many years.  He denied any paranoid ideation or
11       auditory or visual hallucinations.  He was articulate and appeared bright.
         He was somewhat intellectualized in his presentation, but was open and
12       relevant in his thoughts.

13   Dr. Taylor concluded with the following assessment of petitioner's current dangerousness:

14       Mr. Bertagna has upgraded himself educationally, vocationally, and in
         self-help groups.  He remains committed to self-help groups and self-
15       improvement.  While substance abuse appears to have played a part in the
         crime, he appears to remain committed to a sober lifestyle.  He has
16       marketable skills and his vocational plans appear realistic, upon
         verification.  He has an exemplary disciplinary record and an admirable
17       vocational history while in prison.  He voices responsibility for his actions
         in the crime and conducts himself in a mature manner.  He does not
18       evidence anger, or behavioral or emotional dyscontrol in his actions.
         Overall, for these reasons, he is considered to represent a low risk of
19       dangerousness (on a scale of low, medium, high) upon release.

20       2004 – An evaluation was performed by staff psychologist Stephanie A. Wagner,

21   Ph.D., incident to a July 2004 parole suitability hearing.  Dr. Wagner prepared her report based

22   on a review of petitioner's file and a two-hour interview.  Dr. Wagner's clinical assessment was

23   as follows:

24       The inmate was alert and fully oriented to time, date, place, and purpose of
         this evaluation.  He was cooperative and responsive to questioning during
25       the interview.  His appearance and behavior were unremarkable.  His
         mood appeared to be stable and his affect was appropriate to the content of
26       the conversation.  He did not report any sleeping or eating disturbances.

1
2
3
4
5

His fund of information was within normal limits.  His intellectual functioning appeared to be average.  His thought processes were organized and his reality contact seemed intact.  He denied experiencing any perceptual distortions such as hallucinations, delusions, or other unusual experiences.  His recent and remote memory appeared to be intact.  His attention and concentration appeared to be within normal limits.  His abstract reasoning, insight, and judgment seemed good.  He denied any current suicidal or homicidal plans/ideation. . . .

6  Dr. Wagner assessed polysubstance abuse in full remission and assigned a global assessment of

7  functioning ("GAF") score of 95 out of 100.  She noted 12 factors which suggest a reduced risk

8  of violence and concluded that petitioner posed a risk lower than other minimum security

9  inmates.

10          2001 – Petitioner was interviewed by clinical psychologist Melvin Macomber,

11  Ph.D., on November 19, 2001.  Dr. Macomber concluded:

12
13
14
15
16
17

Mr. Bertagna is free of any mental or emotional problems. . . .  He has made gains in maturity over the last three years.  He has a very good attitude and his feelings of remorse are quite sincere and genuine.  Violence potential continues to decrease in this case.  At this point in time his potential for violence in the unstructured setting of the community is seen as below average in comparison to other inmates.  In the past, violence potential has been directly related to use of alcohol and drugs.  At this point in his life, future risk for the use of alcohol and drugs is remote.  There are no psychological factors evidenced in this case that would interfere with a parole date being granted at this time.

18          1998 – Dr. Macomber prepared an earlier report following a parole suitability

19  assessment interview on December 11, 1998.  Dr. Macomber assigned petitioner a GAF score of

20  90 and concluded:

21
22
23

There is no evidence of psychopathology that would preclude routine release planning in this case.  There is no evidence of mental or emotional problems that would require participation in psychotherapy or further evaluation.  He has obtained a viable trade at this time.  Ongoing participation in Alcoholics Anonymous is recommended.

24  Dr. Macomber assessed petitioner's violence potential as average.

25  / / /

26  / / /

1    <u>1993</u> – The record references a July 1993 evaluation conducted by Ronald Kitt,

2    Ph.D.  Dr. Kitt concluded that petitioner's potential for violence was average in light of alcohol

3    and drug dependence and poor judgment and weak impulse control.

4

5                          **II.  STANDARDS OF REVIEW**

6          Because this action was filed after April 26, 1996, the provisions of the

7    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

8    applicable.  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Calderon v. United States Dist. Ct.</u>

9    <u>(Beeler)</u>, 128 F.3d 1283, 1287 (9th Cir. 1997), <u>cert.</u> <u>denied</u>, 522 U.S. 1099 (1998).  The AEDPA

10   does not, however, apply in all circumstances.  When it is clear that a state court has <u>not</u> reached

11   the merits of a petitioner's claim, because it was not raised in state court or because the court

12   denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

13   habeas court must review the claim de novo.  <u>See</u> <u>Pirtle v. Morgan</u>, 313 F.3d 1160 (9th Cir.

14   2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

15   petitioner's claim under its "re-litigation rule"); <u>see also</u> <u>Killian v. Poole</u>, 282 F.3d 1204, 1208

16   (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

17   perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

18   evidentiary hearing in federal court); <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

19   petition de novo where state court had issued a ruling on the merits of a related claim, but not the

20   claim alleged by petitioner).  When the state court does not reach the merits of a claim,

21   "concerns about comity and federalism . . . do not exist."  <u>Pirtle</u>, 313 F. 3d at 1167.

22          Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

23   not available for any claim decided on the merits in state court proceedings unless the state

24   court's adjudication of the claim:

25                (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as determined
26            by the Supreme Court of the United States; or

                                      8

1               (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
2               court proceeding.

3 Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

4 "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

5 standards, "clearly established law" means those holdings of the United States Supreme Court as

6 of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

7 (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

8 the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

9 banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

10 relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

11 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

12 For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

13 to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

14 state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

15 contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

16 created by state conduct at trial because the Court had never applied the test to spectators'

17 conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

18 holdings.  See Carey, 549 U.S. at 74.

19         In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

20 majority of the Court), the United States Supreme Court explained these different standards.  A

21 state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

22 the Supreme Court on the same question of law, or if the state court decides the case differently

23 than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

24 court decision is also "contrary to" established law if it applies a rule which contradicts the

25 governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

26 that Supreme Court precedent requires a contrary outcome because the state court applied the

1   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

2   Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

3   id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

4   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

5   1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

6   case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

7   is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

8          State court decisions are reviewed under the far more deferential "unreasonable

9   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

10  unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

11  510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

12  that federal habeas relief may be available under this standard where the state court either

13  unreasonably extends a legal principle to a new context where it should not apply, or

14  unreasonably refuses to extend that principle to a new context where it should apply.  See

15  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

16  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

17  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

18  75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

19  even where the federal habeas court concludes that the state court decision is clearly erroneous.

20  See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

21  deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

22  As with state court decisions which are "contrary to" established federal law, where a state court

23  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

24  unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

25  ///

26  ///

1    The "unreasonable application of" standard also applies where the state court

2  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

3  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

4  are considered adjudications on the merits and are, therefore, entitled to deference under the

5  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

6  The federal habeas court assumes that state court applied the correct law and analyzes whether

7  the state court's summary denial was based on an objectively unreasonable application of that

8  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

9

10                           **III.  DISCUSSION**

11    In his petition, petitioner argues that the governor's reversal of the Board's

12  decision to grant parole resulted in a violation of due process.  Specifically, he contends that the

13  unchanging facts of his commitment offense and criminal history do not indicate current parole

14  unsuitability and that there is no evidence supporting the governor's decision.  Respondents

15  argue that there is no clearly established Supreme Court precedent entitling petitioner to federal

16  habeas relief.  Specifically, respondents argue:  (1) petitioner's claim is not cognizable because

17  he has no protected liberty interest in parole; (2) even if he does have a liberty interest in parole,

18  due process was satisfied because petitioner was provided an opportunity to be heard and a

19  statement of reasons for the decision; and (3) if petitioner has a protected liberty interest in parole

20  and due process requires "some evidence" to support the governor's decision to deny parole, this

21  standard was met based on the facts of petitioner's commitment offense.

22      **A.      Applicable Law**

23        In Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc), the Ninth Circuit

24  sitting en banc held that there is no federal stand-alone substantive due process right to parole.

25  See 603 F.3d 546, 555 (9th Cir. 2010) (en banc).  Any substantive due process interest in parole

26  arises solely from state law creating the right.  See id.  The Ninth Circuit overruled its prior

decisions in <u>Biggs v. Terhune</u>, 334 F.3d 910, 915 (9th Cir. 2003), <u>Sass v. Bd. of Prison Terms</u>, 461 F.3d 1123 (9th Cir. 2006), and <u>Irons v. Carey</u>, 505 F.3946, 851 (9th Cir. 2007), "[t]o the extent [they]. . . might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release. . . ."  <u>Hayward</u>, 603 F.3d at 555.

Turning to whether California's parole scheme creates any substantive due process rights, the Ninth Circuit stated: "Although the due process clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of future dangerousness, state law may supply a predicate for that conclusion."  <u>Id.</u> at 561.  The court then discussed California law, including the California Supreme Court's decisions in <u>In re Lawrence</u>, 44 Cal.4th 1181 (2008), and <u>In re Shaputis</u>, 44 Cal.4th 1241 (2008), and noted that ". . . as a matter of state law, 'some evidence' of future dangerousness is indeed a state *sine qua non* for denial of parole in California."  <u>Id.</u> at 562.  The court then provided the following instructions for resolving parole claims in the context of AEDPA:

> Since the "some evidence" requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the future, need only decide whether the California judicial decision approving the . . . decision rejecting parole was an "unreasonable application" of the *California* "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence."

> <u>Id.</u> (italics added).[2]

---

[2]   As Magistrate Judge Hollows astutely observed in another case:

> <u>Hayward</u> is, of course, the law in this Circuit and must be followed.  However, its decision to forego an analysis on whether a federal liberty interest created by state law created a *federal* due process right to a "some evidence" standard, because the federal courts can in any event require adherence to a *state* standard, is "fingernails on the chalkboard" in habeas jurisprudence.  The Supreme Court has constantly admonished that federal courts in habeas corpus jurisdiction do not sit to enforce state law requirements.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 72-73, 112 S.Ct. 475 (1991).  Rather, if state law has created a liberty interest under the federal Constitution, the process due on account of that federal interest is determined by federal law.  In other words, the federal liberty interest created by state law does not constitutionalize the entire state process

1  The en banc court concluded that Hayward had properly been denied parole because the nature of

2  the commitment offense combined with an unfavorable psychological evaluation provided "some

3  evidence" under California law of future dangerousness.  See id.

4        Interpreting the en banc decision in Hayward, the Ninth Circuit in Person v.

5  Muntz stated:  "By holding that a federal habeas court may review the reasonableness of the state

6  court's application of the 'some evidence' rule,  Hayward, necessarily held that compliance with

7  the state requirement is mandated by federal law, specifically the Due Process Clause."  606 F.3d

8  606, 609 (9th Cir. 2010) (per curiam).  The court observed that "[t]he principle that state law

9  gives rise to liberty interests that may be enforced as a matter of federal law is long-established."

10  Id.

11        As has been clearly stated by the Ninth Circuit, California law provides the

12  contours of the substantive due process right to parole at issue in this case.  Under California law,

13  one year prior to an inmate's minimum eligible parole release date, the Board will set a date for

14  an eligibility hearing.  See Cal. Penal Code § 3041(a).  A release date shall be set unless release

15  currently poses an unreasonable risk of danger to society.  See Cal. Penal Code § 3041(b).  The

16  paramount concern in determining parole suitability in California is public safety.  See In re

17  Dannenberg, 34 Cal.4th 1061 (2005).  This requires an assessment of the inmate's current

18  dangerousness.  See In re Lawrence, 44 Cal.4th at 1205.  Such an assessment requires more than

19  "rote recitation of the relevant factors with no reasoning establishing a rational nexus between

20  those factors and the necessary basis for the ultimate decision – the determination of current

21  dangerousness."  Id. at 1210.

22

23        underlying the state law creating the liberty interest – federal law
24  determines the minimum due process standards applicable to the interest.
   Moran v. Godinez, 57 F.3d 690, 698 (9th Cir. 1994); see also Rivera v.
   Illinois, ___ U.S. ___, 129 S.Ct. 1446, 1454 (2009) ("The Due Process
25  Clause, our decisions instruct, safeguards not the meticulous observance of
   state procedural prescriptions, but 'the fundamental elements of fairness in
26  a criminal trial.'").

California regulations set forth various circumstances which tend to show suitability and others which tend to show unsuitability.  See Cal. Code Regs., tit 15 § 2402(c)-(d). Under § 2402(c), circumstances tending to show unsuitability include: (1) the facts of the commitment offense, where the offense was committed in an especially heinous, atrocious, or cruel manner; (2) the prisoner's previous record of violence; (3) a history of unstable relationships with others; (4) commission of sadistic sexual offenses; (5) a lengthy history of severe mental problems related to the offense; and (6) serious misconduct while in prison. Circumstances tending to show suitability include: (1) lack of a juvenile record; (2) reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) lack of significant history of violent crimes; (5) realistic plans for release; and (6) participation in institutional activities indicating an enhanced ability to function within the law upon release.  See Cal. Code Regs., tit. 15 § 2402(d).  The regulations are designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole.  In re Lawrence, 44 Cal.4th at 1202.  There must be a rational nexus between the facts cited by the Board and the ultimate conclusion on dangerousness.  See id. at 1227.

Regarding reliance on the facts of the commitment offense, the denial of parole may be predicated on the commitment offense only where the Board can point to factors beyond the minimum elements of the crime that demonstrate that, at the time of the suitability hearing, the inmate will present an unreasonable risk of danger to society if released.  See In re Dannenberg, 34 Cal.4th at 1071.  While the Board cannot require an inmate to admit guilt in order to be found suitable for parole, see Cal. Penal Code § 5011(b); 15 Cal Code Regs., tit. 15, § 2236, the Board must consider the inmate's past and present attitude toward the crime and any lack of remorse or understanding of the nature and magnitude of the offense, see 15 Cal. Code Regs., tit. 15, §§ 2402(b), 2402(d)(3).  "Lack of insight" is probative of unsuitability only to the extent that it is both demonstrably shown by the record and rationally indicative of the inmate's

1   current dangerousness.  See In re Calderon, 184 Cal.App.4th 670, 690 (2010).

2        **B.**   **Analysis**

3        Here, petitioner was convicted of second degree murder after he and Eric Warner

4   killed Wusstig apparently for the purpose of intimidation.  The victim was shot and then his

5   throat was slashed.  The victim was someone the defendant knew and not a random person off

6   the street killed for no reason at all.  Petitioner was sentenced to 15 years to life in prison.  While

7   the Board found petitioner suitable for parole, the governor reversed based on the unchanging

8   facts of the commitment offense.

9        The record, discussed in detail above, reflects that petitioner has been a model

10   prisoner and has clearly demonstrated rehabilitation while in prison.  In addition, and contrary to

11   the Shasta County District Attorney's characterization as "murky," petitioner's psychological

12   evaluations have been glowing and show consistent progress from a man who was troubled by

13   drug and alcohol dependence to a man whose drug and alcohol dependence is in full remission

14   and who is committed to a sober lifestyle.  In 2001, 2004, and again in 2006, the psychologists

15   assessed petitioner's risk of danger to the community as low.  In addition, at the time of the

16   governor's reversal in 2006, petitioner had good plans for himself upon release.  He had family

17   support, a place to live, and several job prospects.

18        Here, the governor reversed the Board's decision, citing only immutable factors.

19   In particular, the governor concluded: ". . . The gravity of this senseless crime is alone sufficient

20   for me to conclude presently that David's release from prison would pose an unreasonable public

21   safety risk."  Under California law, however, reliance solely on the facts of the commitment

22   offense is only proper where there are factors beyond the minimum elements of the crime that

23   demonstrate an unreasonable risk of danger.  See In re Dannenberg, 34 Cal.4th at 1071.  In this

24   case, the facts cited by the governor do not indicate factors which go beyond the minimum

25   elements of second degree murder.

26   ///

1      The court finds in this case that the governor's reversal of the Board's decision to

2   grant parole was arbitrary in light of the facts and, therefore, denied petitioner due process of law.

3   The court also finds that the state court's denial of petitioner's habeas claim was an unreasonable

4   application of the "some evidence" standard.[3]   In particular, there is no evidence whatsoever in

5   the record which would support the conclusion that petitioner currently poses an unreasonable

6   risk of danger to the community if released (or, for that matter, that he posed an unreasonable

7   risk in 2006).  To the contrary, the record clearly demonstrates that the risk of danger, if any, is

8   minimal and, therefore, entirely reasonable.  The record demonstrates that, if he had been

9   released in 2006, petitioner would most likely have maintained a sober lifestyle, avoided

10  violence, and become a productive member of society.  In short, the record reveals an inmate

11  who has been rehabilitated.

12      The governor's reliance on the facts of petitioner's commitment offense – which

13  can never change, despite any efforts petitioner may make – ignores the rehabilitative goal of

14  incarceration.[4]  While it certainly satisfies the punitive goal, the state has held out the hope of

15  release upon rehabilitation by providing a parole scheme and by sentencing petitioner to a term

16  less then life without the possibility of parole.  If the state truly believed that petitioner's crime

17  was one that warranted a life in prison without hope, it could have provided for that punishment

18  for second degree murder, charged him with first degree murder, or repealed its parole scheme.

19  But it did not do any of these things.  Instead, the state sentenced petitioner to a minimum of 15

20  years and told him that he could be released after that time if he was no longer a danger to

21  society.  In fact, the state's parole scheme mandates release where, as here, the prisoner does not

22  currently pose an unreasonable risk of danger.

23  _____

24      [3]      Because the state court applied the correct legal test, the "contrary to" standard of
review does not apply.

25      [4]      Which, of course, is somewhat ironic given that the California agency responsible
for incarceration was recently re-named the California Department of Corrections *and*
26  *Rehabilitation*.

1    Petitioner has lived up to his obligation of rehabilitating himself despite the

2  countless obstacles he no doubt faced during his many years in prison.  In failing to live up to its

3  obligation under its own parole scheme, the state has essentially re-sentenced petitioner to life

4  without the possibility of parole.  Not only is this unfair, it seems to the court that the blind

5  reliance solely on immutable factors in cases such as this where there has clearly been

6  rehabilitation is not sound public policy.  The State of California currently faces a staggering

7  budget crisis.  In addition, California's prisons are woefully overcrowded.  The state could ease

8  both problems by releasing inmates who have been rehabilitated.  Not only would this reduce the

9  number of inmates in California's prisons, the state would enjoy the cost savings of not having to

10  pay for the prisoner's continued incarceration as well as the potential tax revenue generated by a

11  rehabilitated and productive citizen.

12    Having determined that petitioner's right to due process was violated, the court

13  turns to the appropriate remedy in such cases.  The Ninth Circuit recently discussed the

14  appropriate remedy in a parole challenge habeas case in Haggard v. Curry, ___ F.3d ___ (9th Cir.

15  2010), 2010 WL 4015006.  Citing the California Supreme Court's decision in In re Prather, 50

16  Cal.4th 238 (2010), the court concluded that "prisoners whose parole denials were not based on

17  'some evidence' of current dangerousness are entitled under state law only to a new parole

18  suitability decision. . . ., and not to release from custody or a judicial parole determination."

19  Haggard, 2010 WL 4015006, at *4.  Because the Board is not a party to this action, and this

20  court may only enjoin the proper respondent – in this case the prison warden – the court finds

21  that the appropriate remedy is to order petitioner's release from custody unless a new suitability

22  hearing is held within a time certain.

23  / / /

24  / / /

25  / / /

26  / / /

1

### IV.  CONCLUSION

2              Based on the foregoing, the undersigned recommends that petitioner's petition for

3   a writ of habeas corpus (Doc. 1) be granted and that petitioner be released from custody unless a

4   new parole suitability hearing is held within 45 days of entry of final judgment.

5              These findings and recommendations are submitted to the United States District

6   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

7   after being served with these findings and recommendations, any party may file written

8   objections with the court.  Responses to objections shall be filed within 14 days after service of

9   objections.  Failure to file objections within the specified time may waive the right to appeal.

10  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11

12  DATED: December 21, 2010

13

14                                          CRAIG M. KELLISON
                                            UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26